UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DUPONT HARRIS, ) | CASE NO. 1:16CV2661 |
| ) | |
| Plaintiff, ) | JUDGE BENITA Y. PEARSON |
| ) | |
| v. ) | Magistrate Judge George J. Limbert |
| ) | |
| NANCY A. BERRYHILL[1], ) | |
| ACTING COMMISSIONER OF SOCIAL ) | REPORT AND RECOMMENDATION |
| SECURITY ADMINISTRATION, ) | OF MAGISTRATE JUDGE |
| ) | |
| Defendant. ) | |

Plaintiff Dupont Harris ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his application for Supplemental Security Income ("SSI"). ECF Dkt. #1. In his brief on the merits, filed on March 7, 2017, Plaintiff asserts that the administrative law judge ("ALJ") erred in the weight assigned to the opinion evidence. ECF Dkt. #12. Defendant filed a response brief on May 8, 2017. ECF Dkt. #14. Plaintiff did not file a reply brief.

For the following reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for SSI on June 14, 2013. ECF Dkt. #10 ("Tr.") at 163.[2] The application was denied initially and upon reconsideration. *Id.* at 77, 90. Plaintiff then requested a hearing, which was held on June 23, 2015. *Id.* at 31. On January 28, 2016, the ALJ issued a decision denying Plaintiff's claim. *Id.* at 10. Subsequently, the Appeals Council denied

---

[1]On January 23, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed as a .PDF, rather that the page numbers assigned by the CM/ECF system. When the Transcript was filed the .PDF included an index, with the indexed pages differentiated from the numerical pages. Accordingly, the page number assigned in the .PDF mirrors the page number printed on each page of the Transcript, rather than the page number assigned when the Transcript was filed in the CM/ECF system.

Plaintiff's request for review. *Id.* at 1. Accordingly, the January 28, 2016, decision issued by the ALJ stands as the final decision.

The instant suit was filed by Plaintiff on November 1, 2016. ECF Dkt. #1. On March 7, 2017, Plaintiff filed a brief on the merits. ECF Dkt. #12. Defendant filed a response brief on May 8, 2017. ECF Dkt. #14. Plaintiff did not file a reply brief.

## II.     RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.     Medical Evidence

On March 22, 2012, Plaintiff sought treatment for auditory hallucinations and reported hearing voices instructing him to kill his mother, others around him, and himself.[3] Tr. at 271, 289. Plaintiff also reported a history of drug and alcohol abuse. *Id.* at 289. At the time of this treatment, Plaintiff was receiving housing and recovery services, and indicated that he was experiencing withdrawal symptoms. *Id.* at 274, 289.

Plaintiff sought emergency medical treatment on January 1, 2013, stating that he had been drinking alcohol and smoking marijuana. Tr. at 436. Treatment notes indicated that Plaintiff was too intoxicated to provide a coherent history of his medical condition(s) and that the care provider was unable to understand most of what Plaintiff was saying due to severe slurring of his words. *Id.*

On March 8, 2013, Plaintiff underwent a mental health assessment and complained of feeling anxious around "a lot of people," feeling depressed daily, anhedonia, and feelings of guilt. Tr. at 278. Plaintiff denied excessive anger and indicated that he was unsure if he experienced panic attacks. *Id.* Additionally, Plaintiff reported seeing monsters, paranoia, and that he stayed in his house due to fear. *Id.* Plaintiff reported that in the past year he had not had five or more alcoholic drinks on a single day and that he had not used illegal drugs in the past five years, however, Plaintiff also reported that he was in an inpatient treatment program in June 2012 for polysubstance abuse, including heroin and alcohol. *Id.* at 279-80. It was noted that

---

[3]Plaintiff does not challenge the ALJ's determination regarding his physical impairments or corresponding limitations. *See* ECF Dkt. #12. Accordingly, medical and opinion evidence relating to any alleged physical impairments is not discussed herein as it does not impact the issues raised by Plaintiff.

-2-

Plaintiff displayed poor hygiene, clear speech, logical thought processes, fair judgment and insight, good recent and remote memory, sustained attention span and concentration, and a dysphoric and overwhelmed mood. *Id.* at 281. The licensed social worker interviewing Plaintiff issued a diagnostic impression of schizophrenia, paranoid type, rule-out polysubstance dependence, and a global assessment of functioning ("GAF") score of fifty-one to sixty. *Id.* at 282.

Plaintiff reported experiencing panic attacks on a nearly daily basis, feeling scared, and hearing voices on March 21, 2013. Tr. at 233. According to Plaintiff, he began having panic attacks when he was nine years old and started hearing voices when he was nineteen years old. *Id.* Plaintiff reported that his symptoms increased since he stopped using drugs the prior summer. *Id.* at 234. On examination, Plaintiff displayed: some signs of neglect and appeared older than his stated age; guarded behavior; orientation to time, person, and place; slow speech; a disorganized thought process; paranoid ideation; auditory hallucinations; visual hallucinations; poor judgment and insight; distractible attention span and concentration; euthymic mood; poor energy and motivation; fair concentration; and blunted affect. *Id.* at 236. Mary Lieder, the certified nurse practitioner ("CNP") that performed the examination, diagnosed schizophrenia, paranoid type, and assigned a GAF score of thirty-one to forty. *Id.* at 237.

On April 24, 2013, Plaintiff reported that he "felt a lot better," was sleeping better, and felt more at ease. Tr. at 231. Upon examination, Plaintiff displayed: adequate grooming; cooperative behavior; orientation to time, person, and place; spontaneous speech with normal rate and flow; logical and organized thought processes; euthymic mood; good appetite; good energy; constricted affect; sustained concentration and attention; recent and remote memory within normal limits; and fair judgment and insight. *Id.* Plaintiff reported that his paranoid thoughts were "going down" and that he was experiencing just a "little bit of hallucinating." *Id.*

Plaintiff reported to the emergency room on May 19, 2013, reporting that he had tripped and hit his head while walking up concrete steps. Tr. at 391. Plaintiff stated that he had been drinking alcohol that morning, prior to his fall. *Id.*

In June 2013, Plaintiff reported that he continued to feel better and that his family noticed improvement.  Tr. at 228.  CNP Lieder examined Plaintiff and noted that he displayed: adequate grooming; cooperative behavior; orientation to time, person, and place; spontaneous speech with normal rate and flow; logical and organized thought processes; eurythmic mood; "fine" appetite; better energy and motivation; sustained attention and concentration; recent and remote memory within normal limits; and fair judgment and insight.  *Id.*  It was also noted that Plaintiff reported that his paranoid thoughts were "much decreased," and that his visual and auditory hallucinations were very infrequent.  *Id.*  CNP Lieder continued Plaintiff's medications at the same dose.  *Id.* at 229.

On August 23, 2013, Plaintiff underwent a psychological consultative evaluation with an examining psychologist, Mitchell Wax, Ph.D.  Tr. at 462.  Dr. Wax noted that Plaintiff could not provide clear information about why he could not work, instead simply stating "I can't work." *Id.*  Continuing, Dr. Wax noted memory problems when Plaintiff could not remember much of his lengthy history of arrests and incarcerations.  *Id.* at 463.  Dr. Wax noted that Plaintiff indicated that he was a recent alcoholic and drug abuser, and stated, "I was drinking daily, and I've been drinking off and on for many years."  *Id.*  Plaintiff reported that he last used crack cocaine and phencyclidine ("PCP") in 2012, and stated, "I was using drugs off and on for many years too."  *Id.*  Next, Plaintiff stated that he had been drug free for the past year.

As for daily activity, Plaintiff reported that went to bed at 11:00 P.M. and woke at 8:00 A.M.  Tr. at 464.  Plaintiff stated that he knew how to cook, but did not cook.  *Id.*  Continuing, Plaintiff indicated that his female friend cooked for him, washed his laundry, and cleaned his apartment.  *Id.*  Plaintiff stated that on a typical day he watched television by himself until noon, then took a two-hour walk to exercise his leg.  *Id.*  Following his walk, Plaintiff would watch television until 5:00 P.M.  *Id.*  Plaintiff stated that his mother and brother came to his apartment four to five times a week to visit, and sometimes they would stay for dinner.  *Id.*  Regarding the female friend, Plaintiff stated that she was not a girlfriend, but that she came over daily.  *Id.*  Plaintiff denied contact with any other friends and stated that he attended church twice per month.  *Id.*

Dr. Wax indicated that Plaintiff presented as a pleasant man who had intermittent memory problems. Tr. at 464. Continuing, Dr. Wax noted that Plaintiff appeared confused and distant initially, but that he was able to focus and become more alert as the session progressed. *Id.* Dr. Wax remarked that Plaintiff displayed intermittent mumbling to himself and that at times Plaintiff appeared to withdraw into his own thoughts. *Id.* Next, Dr. Wax indicated that Plaintiff stated that he hallucinated and heard voices. *Id.* Plaintiff's speech was initially vague and circumstantial, and Dr. Wax noted that Plaintiff was able to focus for five to ten minutes before drifting off. *Id.* at 465. When Plaintiff drifted off, he had difficulty providing information about himself and appeared to be listening to auditory hallucinations. *Id.* Plaintiff reported having panic attacks twice per week and described his mood as depressed. *Id.* Dr. Wax was unable to estimate Plaintiff's IQ due to his psychosis, and indicated that he appeared to be hallucinating during the evaluation. *Id.* Following the examination, Dr. Wax diagnosed Plaintiff with: schizoaffective disorder, bipolar type, and polysubstance dependence in remission for one year, and assigned a GAF score of thirty-one. *Id.* at 466. Dr. Wax opined that Plaintiff would have difficulty: understanding, remembering, and carrying out instructions for a job; maintaining attention and concentration; performing simple tasks during psychotic episodes; responding appropriately to coworkers, supervisors, and work pressures in a work setting; and attending and focusing regularly on a job. *Id.* at 466-67.

On September 9, 2013, a state agency psychologist, Robelyn Marlow, Ph.D., reviewed Plaintiff's medical file and opined that he: would be able to maintain concentration, attention, persistence, and pace for simple tasks; and retained the ability to interact superficially with others and perform routine tasks when sober. Tr. at 85-87. Dr. Marlow noted that Dr. Wax's opinion appeared to be an overestimate of Plaintiff's limitations that was based on a snapshot of his functioning. *Id.* at 87. On December 16, 2013, state agency psychologist Karl Voyten, Ph.D., concurred with Dr. Marlow's assessment. *Id.* at 102-103.

Plaintiff was examined by CNP Lieder on September 26, 2013. Tr. at 225. On examination, Plaintiff reported that he was still feeling better, but that the "sometimes wakes up feeling he is dead." *Id.* at 225. Plaintiff also stated that he believed he was "getting along ok

with people" and that he was worried about his mother's declining health. *Id.* CNP Lieder noted that Plaintiff displayed: adequate grooming; cooperative behavior; orientation to time, person, and place; spontaneous speech with normal rate and flow; logical and organized thought processes; a "more depressed" mood; "fine" appetite; fair energy and motivation; constricted affect; recent and remote memory within normal limits; and fair judgment and insight. *Id.* at 226. Continuing, CNP Lieder indicated that Plaintiff reported that his paranoid thoughts had worsened, visual hallucinations were occurring occasionally, and auditory hallucinations were "calming down." *Id.*

On October 9, 2013, CNP Lieder completed a medical source statement concerning Plaintiff's mental capacity. Tr. at 479. CNP Lieder opined that Plaintiff would have the rare ability, meaning the activity could not be performed for any appreciable time, in fifteen of the twenty-two categories surveyed in the medical source statement, including the ability to: follow work rules; maintain attention and concentration for extended periods of two-hour segments; maintain regular attendance and being punctual with customary tolerance; deal with work stress; behave in an emotionally stable manner; and complete a normal workday and workweek without interruption from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* Continuing, CNP Lieder indicated that these limitations were cause by schizophrenia, paranoid type, and that she had been treating Plaintiff since March 21, 2013. *Id.* at 480.

In November 2013, Plaintiff told CNP Lieder that he was doing a little better and that he planned to spend the Thanksgiving holiday at his mother's house. Tr. at 482-83. On examination, Plaintiff displayed: adequate grooming; cooperative behavior; orientation to time, person, and place; spontaneous speech with normal rate and flow; logical and organized thought processes; a somewhat depressed mood; "fine" appetite; fair energy and motivation; constricted affect; sustained attention and concentration; recent and remote memory within normal limits; and fair judgment and insight. *Id.* CNP Lieder continued Plaintiff's medication at the same dose. *Id.*

On March 4, 2014, CNP Lieder completed a second medical source statement concerning Plaintiff's mental capacity. Tr. at 507-508. CNP Lieder's assessment remained the same, except that she found that Plaintiff's ability to follow work rules had changed from rare to occasional, meaning that the ability for the activity existed for up to one-third of a workday. *Id.* at 507. That same day, CNP Lieder indicated that Plaintiff reported that he was "[d]oing ok, but needed more medication, and that he spent most of his time with his mother, going to her home to help her. *Id.* at 565. Plaintiff also reported that his mood was better. *Id.* at 566.

On July 1, 2014, CNP Lieder indicated that Plaintiff was "[d]oing ok," taking things day by day, getting out a little, and that he liked to play video games. Tr. at 580. Plaintiff reported that he was experiencing fewer visual and auditory hallucinations, and that he thought the medicine helped. *Id.* at 581. CNP Lieder noted that Plaintiff: had shown improvement; did not consistently attend appointments, likely due to transportation limitations; had been less depressed; and remained paranoid. *Id.* at 582.

### **B.** **Testimonial Evidence**

The ALJ held a hearing on June 23, 2015, with Plaintiff, his attorney, a vocational expert ("VE"), and a medical expert ("ME") present. Tr. at 33. At the hearing, Plaintiff amended the alleged onset date to May 24, 2013, the date his application for SSI was protectively filed. *Id.* at 35. On examination by the ALJ, Plaintiff testified that he had not worked in "probably longer" than ten years. *Id.* at 37. When asked why he was unable to work, Plaintiff responded:

> When I got shot in the leg, and the bullet is still in my leg, it won't come out they said, but I went to the hospital. They said they can't take the bullet out because of my arteries, they have to cut my leg off, so they left it in there, so they left the bullet in there.

*Id.* at 38. The ALJ then asked Plaintiff about his panic attacks, and Plaintiff stated that the attacks "just come and go." *Id.* at 38-39. Plaintiff continued, explaining that he could not remember how long the panic attacks lasted. *Id.* at 39. When asked about his living situation, Plaintiff testified that he stayed with a friend. *Id.* Next, the ALJ asked Plaintiff about his medications. Tr. at 44. Plaintiff stated that he did not experience any side effects from his medications and that he was receiving treatment once a month. *Id.*

-7-

The ALJ then examined a ME who had reviewed Plaintiff's medical records.  Tr. at 45.  When asked about Plaintiff's mental impairments, the ME testified that he had paranoid schizophrenia, as well polysubstance abuse until June 2012, including the use of: heroin; alcohol; marijuana; marijuana dipped in formaldehyde, known as "wet"; PCP; and cocaine.  *Id.* at 46.  The ME stated that Plaintiff entered a rehabilitation program at Y-Haven in June 2012, and, as far as he knew, Plaintiff had not relapsed.  *Id.*  Plaintiff stated that it had been two years since he used any substance.  *Id.* at 46-48.  Following the ALJ's examination of the ME, Plaintiff's attorney was granted the opportunity to examine the ME.  *Id.* at 54.  The ME testified that Plaintiff did have delusions and hallucinations, but that they did not occur at all times.  *Id.*

Next, the ALJ questioned a VE.  Tr. at 57.  The VE testified that an individual with Plaintiff's age, education, past work experience, and residual functional capacity ("RFC") could perform work as a cashier, mail clerk, and vending machine attendant.  *Id.* at 63-66.  Plaintiff's attorney then asked the VE whether the additional limitations of no contact with the general public, rare contact with coworkers, and rare contact with supervisors would impact the VE's assessment of available work.  *Id.* at 74.  The VE testified that with the added limitations, no work would be available.  *Id.*  Plaintiff's attorney stated that there were no further questions for the VE, and the ALJ concluded the hearing.  *Id.* at 74-75.

### III.     RELEVANT PORTIONS OF THE ALJ'S DECISION

After the hearing, the ALJ issued a decision on January 28, 2016.  Tr. at 10.  The ALJ found that Plaintiff had not engaged in substantial gainful activity since May 24, 2013, the date his application for SSI was protectively filed.  *Id.* at 15.  Continuing, the ALJ indicated that Plaintiff had the following severe impairments: paranoid schizophrenia; residuals of a gunshot wound to the left thigh in or about 1995; alcohol abuse in remission since sometime in 2013; marijuana abuse in apparent remission since sometime in 2013; and heroin, PCP, and cocaine abuse, each in apparent remission since in or about June 2012.  *Id.*  The ALJ then determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.* at 16.

Next, the ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 416.967(b), with the following additional limitations: sit for six hours in an eight-hour workday; stand and walk up to six hours in an eight-hour workday, for only thirty minutes at a time; occasionally balance, bend, stoop, crouch, and squat; never kneel or crawl; occasionally climb steps and ramps; never climb ladders, ropes, or scaffolds; occasionally push and pull with the left lower extremity; never work in proximity to unprotected heights, dangerous moving machinery, or other workplace hazards; never operate a motor vehicle as part of a job; never do work with high or strict production quotas; never perform assembly line work or piece rate work; simple, repetitive tasks only; never perform work involving negotiation, arbitration, confrontation, or other interpersonal interactions with the public, coworkers, or supervisors; never manage or supervise other people; never be responsible for the health, safety, or welfare of other people; and never perform work involving frequent changes or variation of tasks or routines, with frequent meaning its common usage and not as defined in the *Dictionary of Occupations Titles* or regulations. Tr. at 18.

When discussing the RFC finding, the ALJ assigned no weight to the opinions of CNP Lieder provided in the medical source statements dated October 9, 2013, and March 4, 2014. Tr. at 21. The ALJ stated that there was no evidence in CNP Lieder's treatment notes or the record as a whole to support her conclusions, and that she was "not an acceptable medical source that [could] render a medical opinion under [the Social Security Administration's] Regulations." *Id.* Continuing, the ALJ indicated that no weight was assigned to the opinions of Dr. Wax because the opinions were based on a one-time examination and were not consistent with the record as a whole. *Id.* at 22. As an example, the ALJ stated that Plaintiff reported to a treatment provider that he took his medications and that his symptoms were stable. *Id.* According to the ALJ, the evidence showed that Plaintiff was not as limited as determined by Dr. Wax. *Id.*

The ALJ next found that Plaintiff was unable to perform any past relevant work, was a younger individual on the date his application was filed, had at least a high school education and was able to communicate in English, and that the transferability of job skills was not an issue because Plaintiff's past relevant work was unskilled. Tr. at 22-23. Considering Plaintiff's age,

education, work experience, and RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. *Id.* at 23. Based on the above, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, since May 24, 2013, the date his application for SSI was filed. *Id.* at 24.

## IV. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence

supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937(citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## VI. LAW AND ANALYSIS

### A. Opinions of CNP Lieder

Plaintiff first asserts that the ALJ erred in assigning no weight to the opinions of CNP Lieder. ECF Dkt. #12 at 10. Specifically, Plaintiff claims that the ALJ erred when assigning CNP Lieder's opinions no weight based on: (1) lack of support in the record as a whole or in CNP Lieder's treatment notes; and (2) CNP Lieder's status as a non-acceptable medical source. *Id.* at 11. Plaintiff avers that lengthy treatment notes and multiple visits support CNP Lieder's opinions, she specializes in behavioral health, and that she had been treating Plaintiff since March 21, 2013. *Id.* Continuing, Plaintiff contends that CNP Lieder documented consistent psychological findings for Plaintiff, including a constricted affect, auditory and visual hallucinations, paranoid thoughts, and an irritable and/or depressed mood. *Id.* at 11-12 (citing Tr. at 226, 228, 231-32, 495, 565-66, 580-81). Plaintiff asserts that the ALJ's perfunctory

-11-

statement that there was no evidence in CNP Lieder's treatment notes or the record as whole to support her conclusions "does not constitute 'good reasons' for rejecting a treating physician's opinion." *Id.* at 12 (citing *Rogers*, 486 F.3d at 245-46). Additionally Plaintiff avers that the decision "lacks a logical bridge between the evidence and the ALJ's determination," and that "[a]s a rule, the ALJ must build an accurate and logical bridge between the evidence and his conclusion." *Id.* at 12-13 (citing *Fleischer v. Astrue*, 744 F.Supp.2d 875, 877 (N.D. Ohio Mar. 1, 2011)).[4]

Regarding the ALJ's determination that CNP Lieder was not an acceptable medical source, Plaintiff asserts that CNP Lieder's opinions are properly classified as opinions from an "other source" under the applicable regulations. ECF Dkt. #12 at 13 (citing Social Security Ruling ("SSR") 06-03p).[5] As such, Plaintiff argues that the ALJ was required to consider additional factors including: the length and frequency of treatment; the consistency of the opinion(s) with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a speciality or area of expertise related to the individual's impairment(s); and any other factors that tend to support or refute the opinion. *Id.* at 14 (citing SSR 06-03p). Plaintiff asserts that the ALJ's failure to assign any weight to CNP Lieder's opinions because they do not meet the traditional definition of treating source is reversible error. *Id.* at 15.

Defendant contends that the ALJ properly weighed the opinion of CNP Lieder. ECF Dkt. #14 at 8. Initially, Defendant states that ALJ properly indicated that CNP Lieder was not an "acceptable medical source" and, accordingly, her opinions were not entitled to the deference generally afforded to treating medical source opinions. *Id.* (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997)). Continuing, Defendant recognizes that SSR 06-03p

---

[4]A review of *Fleischer*, 744 F.Supp.2d at 877, indicates that Plaintiff is referring to the substantial evidence standard, which is detailed above in Section IV of the instant Report and Recommendation.

[5]SSR 06-03p was rescinded on March 27, 2017, after this case was filed and after Plaintiff filed her brief on the merits. *See* SSR 06-03p, https://www.ssa.gov/OP_Home/rulings/di/01/SSR2006-03-di-01.html (last visited January 31, 2018).

explains that an ALJ should recognize all relevant medical evidence in a claimant's record, including the opinions of non-acceptable medical sources. *Id.* (citing SSR 06-03p). Defendant asserts that the ALJ did not simply discount CNP Lieder's opinion because she was not an "acceptable medical source," but instead considered whether her opinion was consistent with the other evidence in the record, including her own treatment notes. *Id.* at 8. Specifically, Defendant indicates that the ALJ noted that while the record documented Plaintiff's history of drug and alcohol abuse, CNP Lieder's treatment notes showed that his mental condition improved with treatment. *Id.* at 9 (citing Tr. at 20). Continuing, Defendant states that throughout Plaintiff's treatment, CNP Lieder's impression was that he was either "stable" or "improving." ECF Dkt. #14 at 10 (citing Tr. at 226, 229, 232, 483, 581). Defendant asserts that these treatment notes contradict CNP Lieder's conclusory assessment that Plaintiff had severe deficits in his ability to use judgment, maintain attention and concentration, and remember and carry out job instructions. *Id.* (citing Tr. at 479-80, 507-508). For these reasons, Defendant maintains that it was reasonable for the ALJ to assign no weight to CNP Lieder's opinions. *Id.*

      Plaintiff's argument is without merit. As an initial matter, Plaintiff has asserted that "[a] perfunctory assessment does not constitute 'good reasons' for rejecting a treating physician's opinion."[6] ECF Dkt. #12 at 12. CNP Lieder is not a treating physician and thus the ALJ was not subject to the heightened "good reasons" standard imposed by the treating physician rule. *See Rogers*, 486 F.3d at 242-43. Continuing, a review of the record affirms the ALJ's finding that CNP Lieder's treatment notes did not support the conclusions stated in her opinions. For example, CNP Lieder opined that Plaintiff had "rare" ability, meaning that the activity could not be performed for any appreciable time, to perform the following activities: use judgment;

---

[6]It appears that Plaintiff later recognizes that the treating physician rule does not apply to CNP Lieder's opinions since he argues that CNP Lieder is an "other source" under the regulations. ECF Dkt. #12 at 13-14.

-13-

maintain attention and concentration for extended periods of two hour segments; and understand, remember, and carry out complex job instructions.[7]  Tr. at 479-80, 507-508.  Despite opining that Plaintiff's ability to perform these activities was "rare," the most restrictive category available on the medical source statements, CNP Lieder's treatment notes consistently indicate that Plaintiff's: judgment was fair; attention and concentration were sustained; and recent and remote memory were within normal limits.  *Id.* at 226, 228, 231, 483, 495, 566, 581.  Further, CNP Lieder's treatment notes state that Plaintiff's mental health was either improving or stable with treatment and medication.  *Id.* at 225-26, 228, 231, 482-83, 494-95, 580.  Likewise, CNP Lieder's treatment notes show that Plaintiff's visual and auditory hallucinations were decreasing with medication.  *Id.*  Accordingly, the ALJ's finding that CNP Lieder's treatment notes did not support her opinions is accurate.  *See* Tr. at 20.  Further, a review of Plaintiff's medical record supports the ALJ's determination that the record as a whole does not support CNP Lieder's conclusions.[8]  *See id.*

Plaintiff also claims that the ALJ did not comply with SSR 06-03p because the factors contemplated therein were not addressed in the decision.  *See* ECF Dkt. #12 at 14.  Specifically, Plaintiff states that the ALJ failed to analyze CNP Lieder's opinions as "other source" evidence because the following factors were not considered: the length and frequency of treatment; the consistency of the opinion(s) with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a speciality or area of expertise related to the individual's impairment(s); and any other factors that tend to support or refute the opinion.  *Id.* at 13-14.

---

[7]CNP Lieder's first medical source statement also indicated that Plaintiff had the "rare" ability to understand, remember, and carry out detailed, but not complex, job instructions. Tr. at 479-80.  The second medical source statement submitted by CNP Lieder indicated that Plaintiff had the "occasional" ability to understand, remember, and carry out detailed job instructions.  *See* Tr. at 507-508.

[8]Additionally, Plaintiff does not cite any evidence in the record provided from sources other than CNP Lieder that contradicts the ALJ's determination that the record as a whole did not support CNP Lieder's opinions.  *See* ECF Dkt. #12 at 10-16.

-14-

The language of SSR 06-03p belies Plaintiff's argument.  SSR 06-03p explains that the above factors can be applied to opinion evidence from "other sources" because they represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources," including "other sources."  After listing the factors that Plaintiff claims that ALJ did not address, SSR 06-03p states that "not every factor for weighing opinion evidence will apply in every case" and that "[t]he evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts of each case."  CNP Lieder is not an "acceptable medical source" and is instead an "other source." *See* 20 C.F.R. §§ 405.1513(a), 416.931(a); SSR 06-03p.  As stated by SSR 06-03p, the factors stated above can be applied to CNP Lieder's opinion, but the ALJ was not obligated to specifically address each factor.

Plaintiff concludes by reiterating that the ALJ committed reversible error by assigning no weight to CNP Lieder's opinions because she did not meet the traditional definition of a treating source and stating that the regulations promise claimants that the ALJ will evaluate every medical opinion received.  ECF Dkt. #12 at 15.  The ALJ did not assign no weight to CNP Lieder's opinion simply because she was not an acceptable medical source.  Rather, the ALJ discussed portions of CNP Lieder's treatment notes and then stated:

> As for the opinion evidence related to [Plaintiff's] mental health condition, I give no weight to the opinions of [CNP] Lieder in the medical source statements dated October 9, 2013, and March 4, 2014.  There is no evidence in her treating notes or the record as a whole to support her conclusions.  In addition, [CNP] Lieder is not an acceptable medical source that can render a medical opinion under our Regulations.

Tr. at 20-21.  The ALJ's decision indicates that there was no evidence in CNP Lieder's treatment notes or the record as a whole supporting her opinions, and thus the opinions were assigned no weight.  *Id.*  The ALJ then added, correctly, that CNP Lieder was not an "acceptable medical source" that could render an opinion.  A review of the ALJ's decision shows that CNP Lieder's treatment records and opinions were reviewed, and that the ALJ assigned no weight to the opinions because they were inconsistent with the rest of the medical evidence, not simply because CNP Lieder was not an "acceptable medical source."  Accordingly, the ALJ did not err

-15-

when assigning no weight to the opinions of CNP Lieder as this decision is supported by substantial evidence.

### B. Opinion of Dr. Wax

Next, Plaintiff asserts that the ALJ erred in assigning no weight to the non-treating source opinion of Dr. Wax, a consulting physician. ECF Dkt. #12 at 16. Plaintiff takes issue with the ALJ's reasons for assigning no weight to Dr. Wax's opinion, namely, that the opinion was based on a one-time examination and was inconsistent with the record as a whole. *Id.* Continuing, Plaintiff avers that the ALJ disputed Dr. Wax's findings by stating that he reported to his treatment provider that his symptoms were stable when he took his medications, and that the ALJ's reliance on the stability of his schizophrenia at a single point in time without considering his ongoing symptomology is error. *Id.* at 17. Plaintiff also contends that Dr. Wax's opinion was consistent with and supported by the findings of CNP Lieder. *Id.*

Defendant asserts that the ALJ properly weighed the opinion of Dr. Wax, and instead adopted the mental limitations assessed by the ME that testified at the hearing. ECF Dkt. #14 at 10. Continuing, Defendant states that the ALJ observed the Dr. Wax based his opinion on a one-time examination and that the opinion was inconsistent with the level of functioning reflected in the treatment notes of record. *Id.* at 11. Defendant indicates that the ME testified that Plaintiff was apparently experiencing an episode of acute psychosis on the date of Dr. Wax's examination. *Id.* (citing Tr. at 54). Additionally, Defendant notes that Dr. Marlow, the state agency psychologist, referred to Dr. Wax's opinion as an "overestimate" of Plaintiff's limitations based on a "snapshot" of his functioning. *Id.* (citing Tr. at 87). Defendant states that the ALJ observed that the treatment notes generally documented Plaintiff's improvement with treatment. *Id.* (citing Tr. at 20). Further, Defendant asserts that the treatment notes did not show any episodes of confusion or difficulty similar to the episode observed by Dr. Wax when Plaintiff was sober. *Id.* at 12. In closing, Defendant contends that it was reasonable for the ALJ to find that Dr. Wax's assessment was inconsistent with the record as a whole, which reflected a higher level of mental functioning and continued mental improvement with abstinence from drugs and alcohol. *Id.*

-16-

Plaintiff's argument is without merit. Dr. Wax's opinion is inconsistent with the record as a whole. During his examination with Dr. Wax, Plaintiff was "actively hallucinating" and "intermittent mental drifting" was noted. Tr. at 466-67. The level of impairment demonstrated by Plaintiff during his examination with Dr. Wax is inconsistent with the other medical evidence of record. Despite Plaintiff's assertion that Dr. Wax's opinion is consistent with CNP Lieder's findings, CNP Lieder's treatment notes consistently indicate that Plaintiff: was adequately groomed; was oriented to time, person, and place; exhibited speech that had normal rate and flow, albeit spontaneous; displayed logical and organized thought processes; displayed sustained attention and concentration; had recent and remote memory within normal limits; and displayed fair judgment. Tr. at 226, 228, 231, 483, 495, 581. While CNP Lieder does note some hallucinations, constricted affect, paranoid thoughts, and instances of irritability, her treatment notes as a whole indicate that Plaintiff's symptoms were improving or controlled with medication. *See id.* Plaintiff does not cite any other evidence in the record he believes is consistent with Dr. Wax's opinion.

The ALJ addressed Dr. Wax's opinion when discussing the relevant medical and testimonial evidence. After doing so, the ALJ indicated that Dr. Wax's opinion was based on a one-time examination and was inconsistent with the record as a whole. A review of the record supports the ALJ's determination that Dr. Wax's opinion was not an accurate representation of Plaintiff's mental impairments and limitations. Accordingly, the ALJ did not err when assigning no weight to the opinion of Dr. Wax as this decision is supported by substantial evidence.

## **VI. CONCLUSION**

For the foregoing reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.


Date: February 1, 2018         */s/George J. Limbert*
                               GEORGE J. LIMBERT
                               UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).